Garfield A. GORDON and Wesley S. Williams, Appellants,

v.

UNITED STATES, Appellee.

Nos. 92–CF–476, 97–CO–1599, 93–CF–512, 97–CO–1348.

District of Columbia Court of Appeals.

Argued May 9, 2000.

Decided Oct. 18, 2001.

Richard S. Greenlee, Public Defender Service, with whom James Klein and Sandra Levick, Public Defender Service, were on brief for appellant, Garfield A. Gordon.

Mark J. Rochon, Washington, DC, for appellant, Wesley S. Williams.

Amul R. Thapar, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, and John R. Fisher, Thomas J. Tourish, Jr. and Oliver W. McDaniel, Assistant United States Attorneys, were on the brief, for appellee.

Before RUIZ, GLICKMAN, and WASHINGTON, Associate Judges.

WASHINGTON, Associate Judge:

Appellants Garfield A. Gordon and Wesley S. Williams were tried jointly and convicted of various criminal offenses in early

1992.[1] At trial, Williams was convicted of second-degree murder while armed, assault with a dangerous weapon, possession of a firearm during a crime of violence, carrying a pistol without a license, conspiracy to distribute drugs, and possession with the intent to distribute (PWID) cocaine. The jury found Gordon guilty of assault with a dangerous weapon, possession of a firearm during a crime of violence, conspiracy to distribute drugs and PWID cocaine. On appeal, appellants raise several issues as grounds for reversal of their convictions. Appellants' primary contentions are: 1) the evidence was insufficient to support their convictions for PWID cocaine on February 8, 1990; 2) the PWID convictions must be reversed because the jury was not properly instructed on co-conspirator liability as required by *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); 3) the trial court erred by allowing the prosecutor to introduce, at trial, hearsay evidence contained in a police radio broadcast; 4) the trial court erred by permitting the prosecutor to introduce evidence of a witness' fear of the appellants; and 5) the prosecutor's closing and rebuttal arguments were improper. We reverse and remand.

## I.

The government prosecuted Garfield Gordon, Wesley Williams, and Junior Higgins[2] for their involvement as co-conspirators in a drug distribution operation that turned deadly. According to the government, Gordon, Williams, and Higgins operated their drug distribution business out of an apartment located on 11th Street N.W., and sold their drugs primarily in the 700 block of Lamont Street, N.W. The government alleged that each of the co-conspirators played a unique role in the overall business. Gordon was primarily responsible for manufacturing and packaging the crack cocaine. Williams' primary role was to recruit drug dealers and collect proceeds from drug sales. Higgins was the primary street dealer for the operation in the 700 block of Lamont Street. In addition to prosecuting Gordon, Williams, and Higgins for their participation in the conspiracy to distribute drugs, the government also charged the appellants with various violent crimes and weapons offenses that arose out of their desire to protect their business enterprise. The specific events which led the government to prosecute the three men occurred on February 8, March 9, and March 11, of 1990.

On February 8, 1990, the police received an anonymous tip that two people were selling drugs in front of 762 Lamont Street. The caller described one of the participants selling drugs as wearing a maroon or burgundy sweater. When the officers arrived at the scene, they discovered Higgins in the open basement area of 762 Lamont Street wearing a sweater that fit such a description. After asking Higgins to step out of the basement, the police officers found nineteen plastic bags containing crack cocaine lying on the floor near where Higgins had been standing. Higgins was arrested for PWID cocaine although the charge against him was "no papered," and he was released. Subse-

---

**1.** While appellants originally filed notices of appeal in April 1992, their original appeals were stayed and the record remanded to the trial court for its consideration of appellants' motions to vacate judgment and for a new trial based on alleged Jencks violations. The matter remained pending in the trial court until November of 1997 when the stay was vacated. The record on appeal was not completed until July 1998 and briefing was not completed until January of 2000.

**2.** Junior Higgins died prior to this appeal.

quently, all three defendants were indicted for this offense based on the government's theory that they were co-conspirators in the drug business.

By March 9, 1990, Higgins had returned to selling drugs on the 700 block of Lamont Street. On this occasion, Higgins was in the process of selling drugs to one of his regular customers, Booker T. Broadway, when he discovered his stash had been stolen. Higgins believed that a rival dealer, Kirk Cheeks, was responsible, so he sought him out and threatened him. After issuing his threat, Higgins apparently tried to leave, but Cheeks followed him into an alley and shot him. According to the government, when Gordon found out about the shooting, he drove over to the 700 block of Lamont Street, N.W. with some friends to seek revenge. The government contends that Gordon, unaware that Cheeks was the shooter, mistakenly assaulted an individual known as Eddie Dickens, as well as others with him, in retaliation for the shooting of Higgins. Gordon was subsequently charged with the assault and related weapon offenses.

Finally, the government alleged that on March 11, 1990, Williams drove over to the 700 block of Lamont Street in a black Honda looking for Cheeks. When Williams saw Cheeks, he called out to him by his nickname, "New York." As Cheeks approached the car, Williams pulled a gun and began shooting at him. Williams missed Cheeks but hit Lamont Simms and his brother, Keith Simms, who were innocent bystanders. Lamont Simms died from his wounds. As a consequence of the armed assault on Cheeks that culminated in the shooting death of Lamont Simms, Williams was charged with committing various violent crimes and weapons offenses.

## II.

### A. Appellants' PWID Convictions

Appellants offer two separate grounds as support for their contention that their PWID convictions must be reversed. First, they argue that there is insufficient evidence in the record to support Higgins' conviction for PWID and, thus, as co-conspirators there is insufficient evidence in the record to support their convictions for the same offense. Second, even if there was sufficient evidence to convict Higgins of PWID, appellants' convictions must be overturned because the trial court failed to properly instruct the jury in a manner consistent with the Supreme Court's decision in *Pinkerton.*

### (1) Sufficiency of the Evidence

On February 8, 1990, Higgins was arrested for PWID cocaine when he was stopped by Officers William Richardson and Victor Bruschnevewitz of the Metropolitan Police Department during a routine drug investigation. According to the officers, they were responding to a radio broadcast that indicated two men were selling drugs in front of 762 Lamont Street, N.W. The tipster who reported the drug activity to the police described one of the individuals selling drugs as wearing a maroon or burgundy sweater, blue jeans, and a black coat. When the officers arrived in the 700 block of Lamont Street, they spotted Higgins talking with the other individual they believed was selling drugs while standing in the open basement area of 762 Lamont Street. Higgins was wearing clothing that matched the description given by the tipster. The officers testified that they told the individual to whom Higgins was speaking to leave the area while they asked Higgins to step out of the basement. Officer Richardson then entered the basement area and recovered nineteen plastic bags of crack cocaine from

the ground next to where Higgins had been standing at the time the officers arrived in the area. The officers arrested Higgins, and a search incident to that arrest revealed that Higgins had $651.00 in small bill denominations on him.

In addition to the officers' testimony, eleven other witnesses testified that Higgins regularly sold drugs in the 700 block of Lamont Street, N.W., and one of those witnesses, Dianne Harrison, testified that she saw Higgins selling drugs from a brown paper bag in front of 762 Lamont Street earlier on February 8, 1990. Finally, the government presented expert testimony that the quantity of drugs recovered and the packaging in which the drugs were found, indicated that the drugs were intended for distribution.

■ In reviewing sufficiency claims, we view the evidence and draw all inferences in the light most favorable to the government. *Speight v. United States,* 671 A.2d 442, 454 (D.C.1996). The prosecution need not negate every possible inference of innocence, *see Irick v. United States,* 565 A.2d 26, 30 (D.C.1989), and evidence is legally insufficient to support a conviction "only where there is no evidence upon which a reasonable mind could infer guilt beyond a reasonable doubt." *Patterson v. United States,* 479 A.2d 335, 338 (D.C.1984). In order to find Higgins guilty of PWID, the government must prove beyond a reasonable doubt that Higgins possessed the crack cocaine, that he did so knowingly and intentionally, and that when he possessed the cocaine he had the intent to distribute it. *See* D.C.Code § 33–541(a)(1) (1996 Repl.). To prove that Higgins constructively possessed the crack cocaine found near his feet, the government had to prove that he "knowingly had both the power and the intention, at a given time, to exercise dominion or control over the cocaine." *Bernard v. United*

*States,* 575 A.2d 1191, 1195 (D.C.1990) (internal citation omitted). *See also United States v. Hubbard,* 429 A.2d 1334, 1338 (D.C.1981).

■ Gordon and Williams argue that the government failed to present sufficient evidence that Higgins intentionally possessed the nineteen bags of crack cocaine that the police found near him in the basement of 762 Lamont Street. They contend that the only probative evidence tying Higgins to the drugs recovered on the night of February 8, 1990, was his proximity to those drugs, and that mere proximity to contraband, without more, cannot support a conviction based on constructive possession. While we agree that Higgins' mere proximity to the drugs is not, by itself, sufficient evidence to support a conviction based on constructive possession, we are satisfied that the evidence in this case sufficiently established that Higgins possessed the drugs found at his feet on the night of February 8, 1990, as part of "an ongoing criminal operation of which that possession [was] a part." *Curry v. United States,* 520 A.2d 255, 263 (D.C.1987) (citations omitted). *See also Hubbard,* 429 A.2d at 1338.

In many respects, the evidence in this case is similar to the evidence that we found sufficient to withstand a motion for judgment of acquittal (MJOA) in *Hubbard.* In that case, two police officers testified that they saw the defendant engaged in what appeared to be two separate narcotic transactions in a high drug trafficking area. *Hubbard, supra,* 429 A.2d at 1338. Specifically, they testified that on one occasion they saw Hubbard exchange what they believed to be drugs for money, and on another occasion they saw Hubbard introduce a prospective buyer to another drug dealer. *Id.* Armed with this information, the police stopped Hubbard and the other individual they believed were selling

drugs, and recovered from the area near them a white paper bag that they had seen the other drug dealer handling earlier in the day. *Id.* The paper bag contained drugs, and both Hubbard and her alleged accomplice were arrested and charged with PWID. Hubbard argued in her case, as Gordon and Williams argue here, that the only probative evidence presented tying her to the drugs found in the paper bag was her mere proximity to the drugs and that mere proximity is not enough to prove constructive possession. After the jury had convicted, the trial court agreed and granted Hubbard's MJOA.

On appeal, we reversed and held that based on the evidence presented, a jury could reasonably conclude beyond a reasonable doubt that Hubbard's conduct, in engaging in and assisting others in engaging in purported drug transactions, amply demonstrated her ability to "guide the destiny" of the drugs that were ultimately recovered from the paper bag found in close proximity to her at the time of arrest. *Id.* Thus, despite the fact that no one testified that they saw Hubbard handle the paper bag or its contents, we found that there was sufficient evidence in the record to conclude that she constructively possessed those drugs.

In this case, as in *Hubbard*, there was substantial evidence presented that Higgins was seen selling drugs in the same location and on the same day that he was arrested. In addition, there was substantial evidence introduced that Higgins regularly and repeatedly sold drugs in and around that same area as "part of an ongoing criminal operation of which possession of the drugs [was] a part." *See Curry, supra,* 520 A.2d at 263. That evidence, combined with the fact that the police recovered nineteen packages of crack cocaine, wrapped in plastic, in close proximity to where Higgins was standing, is convincing proof that there was sufficient evidence to support a finding that Higgins, like Hubbard, constructively possessed the recovered drugs. Consequently, viewing the evidence in a light most favorable to the government, there is sufficient evidence upon which a reasonable juror could infer appellants guilty of PWID beyond a reasonable doubt.

### (2) Pinkerton Instruction

■ Alternatively, appellants argue that even if we find that there is sufficient evidence in the record to sustain Higgins' conviction for PWID, their convictions for the same offense must be overturned because the jury was not properly instructed as to the basis for finding such liability. Because no objection was raised by appellants to the failure of the trial court to give such an instruction, we review this claim for plain error. Under this very stringent standard, reversal is warranted " 'only in exceptional circumstances' where a miscarriage of justice would otherwise result." *Robinson v. United States,* 649 A.2d 584, 586 (D.C.1994) (citations omitted). Thus, appellant "bears the heavy burden of showing that the [jury] instructions as given 'were so clearly prejudicial to substantive rights as to jeopardize the very fairness and integrity of the trial.' " *Id.* (citations omitted). Further, Super. Ct.Crim. R. 30 provides that "no party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection." While Rule 30 could be read literally to bar any review of an appellant's claim of instructional error absent an appropriate objection, the Supreme Court, in interpreting the identical federal rule, held that an appellate court may conduct a limited review of such claims for plain error.

*Jones v. United States,* 527 U.S. 373, 388, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) (citing *United States v. Olano,* 507 U.S. 725, 731–32, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). Thus, while limited plain error review is appropriate under these circumstances, we must be very cautious in our approach to this issue. Specifically, appellants contend that based on the Supreme Court's decision in *Pinkerton, supra,* 328 U.S. at 640, 66 S.Ct. 1180, they could not have been found guilty of PWID unless the jury had been instructed and, thus, had considered whether the substantive crime committed by Higgins was in furtherance of the conspiracy and was a reasonably foreseeable consequence of the conspiracy.

In *Pinkerton,* the Court held that a co-conspirator who does not directly commit a substantive offense may nonetheless be held liable for that offense if it was committed by another co-conspirator in furtherance of the conspiracy and was a reasonably foreseeable consequence of the conspiratorial agreement. *Pinkerton, supra,* 328 U.S. at 646–47, 66 S.Ct. 1180. Thus, in order to convict a co-conspirator for the substantive crimes by another conspirator, the jury must be instructed that they must find that the substantive offense was committed in furtherance of the conspiracy and was a reasonably foreseeable consequence of the agreement. *Nye & Nissen v. United States,* 336 U.S. 613, 621, 69 S.Ct. 766, 93 L.Ed. 919 (1949). *See also United States v. Labat,* 905 F.2d 18, 23 (2d Cir.1990). The purpose of such an instruction is to ensure that the jury does not convict a co-conspirator for the substantive crimes of another co-conspirator merely because they reached an agreement, the essence of conspiracy, without considering whether the necessary connection exists between the acts committed by the co-conspirator and the conspiracy. Thus, even though there may be sufficient evidence in the record of this case for a jury to conclude beyond a reasonable doubt that Higgins was selling drugs on the evening of February 8, 1990, in furtherance of the conspiracy and that the sale was a reasonably foreseeable consequence of the agreement, a *Pinkerton* instruction was necessary to ensure that its verdict on the PWID count with respect to Gordon and Williams reflected their considered judgment that the PWID crime was not an independent act unconnected to the conduct of the conspiracy. In *Nye,* the Supreme Court explained that adhering to these requirements is critically important because "only when a jury has been properly instructed as to the relevant standards to be applied to the evidence does a basis exist for determining whether evidence sufficient to support the verdict was presented to it." *Nye, supra,* 336 U.S. at 621, 69 S.Ct. 766 (citation omitted).

Given the Supreme Court's determination that adherence to the *Pinkerton* requirements is critically important, the government essentially concedes that if Gordon and Williams were convicted of PWID based on a conspiracy theory, it was plain error for the trial court not to have given a *Pinkerton* instruction to the jury. Despite that concession, however, the government contends that reversal is not warranted in this case because the PWID convictions of Gordon and Williams were not premised on their participation in a conspiracy, but were based on a reasonable inference drawn by the jury that Gordon and Williams supplied Higgins with the drugs that he possessed on February 8, 1990. *See United States v. Staten,* 189 U.S.App. D.C. 100, 108, 581 F.2d 878, 886 (1978) (commenting that "a PWID conviction does not require a showing that appellants had an intent to distribute personally ... as long as distribution by someone is the end purpose of

possession"). This latest theory of culpability, however, was never presented to the jury at trial. While the government may have introduced sufficient evidence from which a reasonable juror could conclude beyond a reasonable doubt that Gordon, Williams, and Higgins were involved in a large drug trafficking operation, the government failed to present any evidence to support the argument it makes here that Gordon and Williams provided Higgins with the specific drugs he was found to possess on the night of February 8, 1990. In fact, from the beginning of the trial, the government's theory was one of conspiracy, a fact that was reaffirmed when the prosecutor, in referring to the PWID counts in closing, argued to the jury: "once we have established that a conspiracy existed and a person, one of the co-conspirators, committed an overt act in furtherance of the conspiracy, then each participant in the conspiracy is responsible for any of the actions of the other co-conspirators in furtherance of the conspiracy." However, we need not rule definitively on this plain error issue, since the PWID convictions of Gordon and Williams must be reversed in any event along with the remaining convictions for the reasons discussed in the balance of this opinion.

### B. Eliciting Evidence of A Witness' Fear of Testifying on Re–Direct Examination

■ Appellants also argue that the trial court erred when it failed to grant their request for a mistrial after Kandie Gravette tearfully testified that she feared for her life because of her involvement as a witness against the appellants. In response, the government argues that the trial court did not err in denying appellants' motion for a mistrial because the evidence was properly admitted to explain Gravette's reluctance to testify at trial, as well as to explain the inconsistencies between her grand jury testimony and her trial testimony.

■ The decision to order a mistrial is subject to the broad discretion of the trial court and our standard of review is deferential. *Wright v. United States*, 637 A.2d 95, 100 (D.C.1994). This court is only inclined to reverse "in extreme situations threatening a miscarriage of justice." *Id.* (citing *Goins v. United States*, 617 A.2d 956, 958 (D.C.1992)). We review a trial court's decision regarding the admissibility of evidence for abuse of discretion. *Mercer v. United States*, 724 A.2d 1176, 1182 (D.C.1999). The trial judge may "exclude relevant and otherwise admissible evidence 'if its probative value is substantially outweighed by the danger of unfair prejudice.'" *Id.* at 1184 (citation omitted). "We review the trial court's decision regarding the admissibility of evidence for abuse of discretion.'" *Id.* at 1185 (citation omitted).

Gravette was called as a witness by the government to testify about her personal observations of the appellants' involvement in the distribution of drugs. As a follow-up to her testimony that she had seen crack cocaine in the kitchen area of an apartment that the government alleged was used as the headquarters for the drug operation run by appellants, she was asked to identify the persons she had seen in the apartment handling the drugs. At that point, and contrary to her grand jury testimony, Gravette testified that she did not see appellants in the apartment with the drugs. The actual exchange was as follows:

Q. Did you see, Ms. Gravette, anybody involved with anything you saw in the apartment?

A: I didn't actually see them with the drugs.

Q: What did you see?

A: What did I see?

Q: When you say you didn't see them actually with the drugs.

A: With, no. Not in their hand or anything like that.

Q: Where did you see it?

A: Where did I see the drugs?

Q: Uh-huh.

A: Where I seen it, it was just sitting out. I didn't see nobody with it at the time.

* * * *

Q: Ms. Gravette, do you recall testifying in the grand jury?

A: Yeah.

At this point, the prosecutor read to her that portion of her grand jury testimony where she testified that she saw appellants cooking and packaging drugs in the apartment. After she acknowledged that she had testified before the grand jury that she had witnessed those events in the apartment, the prosecutor continued to question Ms. Gravette about what she saw in the apartment:

Q: Now, Ms. Gravette, in light of your telling us that you did make the statement that you just told us about and I just read to you, I ask you again, what did you see in the apartment.

* * * *

A: Nothing. But a half empty apartment, almost empty, no furniture, a couple of times I did see drugs.

Q: Are you saying you never saw the things you testified about in the grand jury?

A: That is what I testified about in the grand jury.

Q: Did you see those things?

A: Yes.

Gravette, however, continued to waffle during the prosecutor's direct examination and later testified that she did not see appellants inside the apartment handling the drugs, but she testified that she saw both men outside of the apartment. On cross-examination, Gordon's counsel suggested through his questioning that the government influenced Gravette's grand jury testimony by implying that she should cooperate because they knew of her visits to the 11th Street apartment and that they then threatened her with perjury if she tried to recant her testimony at trial:

Q: Okay. Now, you talked about seeing, when the prosecutor asked you a question, you said you saw some drugs cooked in there. Is that what you said?

A: Yeah.

Q: That is not true; is it?

A: No.

Q: Why did you say it?

A: Because I didn't mean it like I said it.

Q: Now, before you went into the grand jury, Ms. Gravette, ... you met with various police officers; is that right?

A: Yes.

Q: And was one of them [Detective Hewick?]

A: Yeah.

Q: And did he come and get you at your house where you were staying and bring you down?

A: Yes.

* * * *

Q: Well, he told you, in effect, that he knew that you went to [the 11th Street apartment] occasionally; right?

* * * *

A: [Y]es.

* * * *

Q: And your grand jury testimony about seeing drugs being cooked up in that apartment was not accurate; right? Not accurate?

A: No.

* * * *

Q: Let me ask you this: Were there any persons connected with the government, Mr. McDaniel, Detective Hewick, any police officers connected with the government that led you into saying certain things?

A: No.

Q: Is there anybody who made known to you that they wanted you to say certain things?

A: Not in my grand jury testimony.

* * * *

Q: But haven't they told you if you don't testify in accordance with the grand jury testimony, you are going to get locked up?

A: Yes.

On redirect examination the prosecutor sought to establish that Gravette's reluctance to testify in a manner consistent with her grand jury testimony was not the result of any threats by the government. The following exchange between the prosecutor and Gravette is at the heart of this controversy:

Q: And the reason [you do not want to be here] is because you are afraid; isn't that right?

A: Yes.

Q: In fact, the reason that you are here is because Trevor and myself came and got you; isn't that right?

A: Yes.

Q: You would like if you had never been a part of this; is that right?

A: Yes.

Q: You don't really want to say what you saw in front of these people; do you?

A: Lord of mercy. What do you think, Oliver?

Q: Kandie, I know the answer to that. (stricken)

A: But I'm still here though; ain't I?

Q: But there are people here who don't understand what the situation is? (stricken)

Q: I am only trying to ask you a question so the Court and jury can understand your testimony. Now I am asking you, why is it that you don't want to say the things that you saw?

A: Let's trade places then, then you will know why. What I have been crying about all week? So stupid. You know why. I live right down the street from these people. I am scared for my life.

A: You keep pushing me to do something. I don't even have a lawyer. I ain't protecting nobody. I never was. You all just want help, trying to get you some good. I ain't doing myself no good here.

* * * *

Q: Now the things I asked you about in your grand jury testimony, Ms. Gravette, at the time that you testified in the grand jury, you were less afraid than you are now?

A: Yeah, I was afraid then. Yes.

A: You see what it took for you to get me down here them times.

* * * *

A: You know I didn't want to come.

Q: But did you feel as afraid as you do now?

A: No.

(Witness crying)

It was at this point that counsel for each of the appellants requested a mistrial. The government opposed the mistrial arguing that the appellants had opened the door for the line of questioning they were now objecting to because of their allega-

tions of government misconduct. In addition, the government argued that Gravette's testimony regarding her fear of appellants was also properly admitted because the prosecutor had a "well-reasoned suspicion" that Gravette had been threatened by one of the appellants.

The trial court's stated reason for denying appellants' motion for a mistrial was that Gordon had "opened the door" for the prosecutor to elicit this testimony by alleging that the witness had been intimidated into giving false testimony by the government. While appellants take issue with the trial court's finding that they "opened the door" for the government to elicit this testimony, we understand the crux of their argument to be that the trial court erred in denying their request for a mistrial by failing to appropriately weigh the prejudicial impact of Gravette's testimony on the appellants' right to a fair trial. While appellants do not necessarily concede that the trial court was correct in ruling that it was appropriate for the government to elicit testimony regarding the reasons for Gravette's general fear of testifying, they contend that it was nevertheless an abuse of discretion for the trial judge to go forward once the witness had indicated that she was reluctant to testify because she was afraid for her life.

■■■■ Generally, evidence showing the bias or motivation of a witness may be relevant in assessing a witness' credibility. *Mercer, supra,* 724 A.2d at 1184. However, it is the responsibility of the trial judge, in the exercise of his or her discretion, to exclude otherwise admissible evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." *Id.* We have defined "unfair prejudice" to mean "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* (citations omitted and in-

ternal quotation marks omitted). Thus, while it may be proper to admit evidence "to explain the specific behavior of a witness, such as inconsistent statements, delay in testifying, or unusual courtroom demeanor," evidence concerning a witness' fear tends to be extremely prejudicial because it appeals to the passions of the jury and may cause the jury to base its decision on something other than the rule of law. *Id.* at 1184. *See also McClellan v. United States,* 706 A.2d 542, 551 (D.C.1997).

Given this legal framework, we now turn to the facts of this case. Although appellants do not appear to be seriously challenging the trial court's decision to allow the government to delve into the reasons why Gravette was a reluctant witness, we will nonetheless briefly address this issue. It is clear from the record that counsel for Gordon was attempting to discredit Gravette's grand jury testimony by suggesting that the police had coerced her into testifying in an untruthful manner to protect herself from prosecution. The record also indicates that counsel for Gordon was attempting to bolster the credibility of Gravette's trial testimony by insinuating that Gravette was testifying reluctantly because she wanted to tell the truth but was being constrained by the threatened perjury prosecution if she recanted her earlier false grand jury testimony. Given Gordon's cross-examination of Gravette, the government was certainly entitled to further explore the allegations of misconduct raised by the defense and explore with the witness the reasons for her reluctance to testify at trial in a manner consistent with her prior grand jury testimony. *Mercer, supra,* 724 A.2d at 1184. Thus, under the circumstances presented in this case, the court did not err in allowing the prosecutor to initially pursue this line of questioning because Gordon "opened the door" by

suggesting that the government had suborned perjury.

As we noted in *Mercer*, however, the fact that the trial court in its discretion determines that the defense has "opened the door" for the admission of certain testimony does not end the trial court's obligation to weigh the evidence and determine whether its probative value is substantially outweighed by its prejudicial impact. *Id.* at 1192. There we stated that:

> [T]he doctrine of curative admissibility is one dangerously prone to overuse[ ] and "[t]his business about 'opening the door' is a much overused issue and it carries with it an oversimplification. Opening the door is one thing. But what comes through it is another. Everything cannot come through the door."

*Id.* (citations omitted). Thus, the question before this court is whether Gravette's testimony regarding her fear of the appellants was substantially more prejudicial than probative, and whether, looking at the totality of the circumstances, the introduction of the fear evidence resulted in a miscarriage of justice, warranting a mistrial. In this regard, we note that in *Mercer* we warned trial courts to be cautious with respect to their decisions to admit highly charged evidence of witness fear and intimidation because "evidence of threats solely going to the general credibility or bias of the witness ... [is] an abuse of discretion as such evidence ha[s] the potential for great prejudice against the defendant." *Mercer, supra,* 724 A.2d at 1184 (citation omitted).

In this case, the prosecution had every right to attempt to establish that Gravette's reluctance to testify at trial was not due to her fear of a possible perjury prosecution, even if, in so doing, the government elicited evidence of her general fear of testifying in open court as a witness in a

criminal case. *See id.* at 1193. When the prosecutor began his redirect examination of Gravette, he immediately began to clarify whether the substance of her grand jury testimony was coerced by threats of throwing her in jail or whether she was simply informed of the penalty of perjury. According to the transcript of her testimony, Gravette stated, "I don't want to be in here" before the prosecutor even began his redirect examination focusing on her fear of testifying. Thereafter, the prosecutor's first three questions to Gravette established that 1) she was afraid, 2) the only reason she was testifying was because the prosecutor came to get her, and 3) she never wanted to participate in the proceedings. At that point, the prosecutor had solicited the reasons for Gravette's reluctance to testify and her possible motive for not testifying in a manner consistent with her grand jury statement. Once the prosecution had elicited this testimony, it should have ended its re-direct examination. *Id.* at 1186. By encouraging Gravette to tell the jurors why she did not want to testify "in front of *these people,*" referring to Gordon and Williams, the questioning by the prosecutor was no longer narrowly tailored to respond to the specific allegation of government intimidation made by Gordon.

In *Mercer,* we explained that "the doctrine of curative admissibility is to prevent prejudice and is not to be subverted into a rule for injection of prejudice." *Id.* at 1192. Thus, the introduction of otherwise inadmissible evidence under the shield of this doctrine is permitted "only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence." *Id.* (citation omitted).

Here, instead of attempting to elicit testimony from Gravette designed to rebut the allegation of police misconduct, the

prosecutor pressured Gravette to testify that it was her fear of the appellants that was causing her to testify inconsistently. Despite several trial court rulings sustaining defense objections to this line of questioning by the prosecutor, including the striking of portions of the redirect examination, the prosecutor's insistent questioning ultimately resulted in the following highly inflammatory statement by Gravette: "Let's trade places then, then you will know why [I don't want to say the things I saw]. What I have been crying about all week? So stupid. You know why. I live right down the street from *these people*. I am scared for my life."

This court in *Mercer* denounced the introduction of unsubstantiated fear of specific reprisal from defendants, concluding that such testimony is prejudicial because "it ... implie[s] that [the witness] had received some type of threat regarding her testimony and ... could very well have aroused the passions of the jury, and suggested a conviction based on their aversion [of the defendants]." 724 A.2d at 1186.

In this case, Gravette's testimony introduced exactly the type of prejudice condemned by this court in *Mercer*. In response to the prosecutor's questions, Gravette had presented the jury with extremely emotional testimony that was without relevance to the specific charges faced by the appellants in this case. Gravette's testimony ended with her crying on the stand after answering the prosecutor's questions. During this portion of the government's redirect examination of Gravette, it is clear from the interaction between the prosecutor and Gravette that the prosecutor was well aware that she was reluctant to testify in front of Gordon and Williams because she feared for her life. However, the prosecutor failed to alert the trial court about the potentially prejudicial evidence

and failed to make any effort to avoid an improper response from the witness by limiting the scope of his questions to address only the defense allegations of government impropriety. In this case, as in *Mercer*, "[g]iven the potential for unfair prejudice, and the availability of an alternative, less prejudicial method to accomplish the same goal [*i.e.*, through questions targeted to elicit testimony only about the alleged potential perjury prosecution], the suggestion that [Gravettes'] recantation of [her] grand jury testimony was the product of fear, was improper." *Id.* at 1188.

Finding that the court erred in allowing the prosecutor to elicit the improper testimony, however, is only the first step. In order to determine whether the error is reversible, we must look to the totality of the circumstances. *Id.* at 1194 (citation omitted). We will reverse, under the nonconstitutional harmless error doctrine, if we cannot say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Id.* (citations omitted). However, reversal is required when the error compromised the fairness of the trial, or "if the error had a possible substantial impact upon the outcome." *Id.* (citations omitted). In making this determination, we must consider "the closeness of the case, the centrality of the issue affected, and the steps taken to mitigate the effects of the error." *Id.* (citations omitted). Because appellants also contend that the prosecutor made several erroneous statements in his closing arguments that prejudiced their right to a fair trial, we will first address those additional claims of error before determining whether the cumulative impact of Gravette's testimony, and any errors resulting from the alleged improper argument by the govern-

ment, resulted in a miscarriage of justice warranting a new trial on any or all of the counts for which the appellants were convicted.

### C. Improper Comments in the Prosecutor's Closing Argument

 Gordon and Williams contend that the prosecutor made several improper comments in his closing and rebuttal arguments that were so prejudicial that a mistrial was warranted in the interest of justice.[3] Although appellants primarily find fault with the prosecutor's conduct, we must review the record for legal error or abuse of discretion by the trial judge. *Irick v. United States*, 565 A.2d 26, 33 (D.C. 1989) (citation omitted). Because appellants raised timely objections to the alleged improper comments that were made during the government's closing and rebuttal arguments to which the trial court chose not to take any remedial action, our review is for harmless error. *Clark v. United States*, 593 A.2d 186, 192 (D.C. 1991); *Franklin v. United States*, 555 A.2d 1010, 1013 (D.C.1989); *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

First, Williams contends that he was substantially prejudiced by the prosecutor's rebuttal argument to the jury that he came to the police station with an alibi for the Simms' murder even before he was formally notified of the charges against him. The apparent basis for this argument was the prosecutor's personal belief that Williams' then attorney, Kenneth

Mundy, had made such a statement when he surrendered Williams to the police. During the government's cross-examination, Williams denied his attorney made such a statement. Nonetheless, the prosecutor argued in rebuttal:

> [Y]ou have the fact that as Wesley Williams admitted on the stand, he came into [the] police station with an alibi before he even knew the date. So how is it that this man knew the date of the murder before he was ever charged or told about the date? Why would he come in talking about [an] alibi? In order to give an alibi defense you have to know the date and time.[4]

This argument is particularly troubling because it suggested to the jury that Williams had confessed his guilt to his trial attorney prior to arriving at the police station. The record reflects that Williams never made such an admission during his trial testimony, and no other government or defense witness testified to such an event. Thus, we conclude that the prosecutor's argument was improper because it implied facts not in evidence and testimony not in the record. *See Lewis v. United States*, 541 A.2d 145, 147 (D.C.1988).

Gordon and Williams also complain that the prosecutor compounded the prejudicial impact of Gravette's testimony about her fear of appellants by again referencing it in his closing argument. In addition, they argue that the prosecutor enhanced the prejudice created by Gravette's testimony when he told the jury that Dianne Harrison was also scared to testify during the trial. Specifically, the prosecutor stated,

---

**3.** In addition to the claims of improper argument addressed in this section, appellants raised several other instances where they allege that the prosecutor misstated the evidence or argued facts not in evidence in either his closing or rebuttal argument. We find unpersuasive appellants arguments that

those misstatements may have materially affected the outcome of the trial.

**4.** Williams' response to the prosecutor that he knew where he was on the day of the shooting also does not support the prosecutor's rebuttal argument.

"[y]ou heard, ladies and gentlemen, that Mrs. Harrison as well was afraid." Again, and soon thereafter the prosecutor repeated, "[n]ow Dianne, even being fearful of testifying, doesn't deny that the car stopped and that she talked to the people in the car. . . ." In addition to the fact that the record does not support the government's argument that Dianne Harrison was fearful of appellants, we conclude that the prosecutor's statement that Harrison was fearful of testifying, and the insinuation that her fear was similar to the fear expressed by Gravette, was an attempt to appeal to the juror's sympathies and, thus, was improper. *See Carpenter v. United States,* 635 A.2d 1289, 1296 (D.C.1993) (citations omitted).

## III.

### *Conclusion*

We are satisfied that Gravette's highly emotional testimony that she feared for her life was erroneously admitted over objection, and we conclude that the error was not harmless. The government's exploitation of that testimony, coupled with the suggestion that Williams confessed to murder by offering a premature alibi to the police, resulted in prejudice that requires reversal of all Gordon's and Williams' convictions and a remand for such further proceedings as appropriate.

*Reversed and remanded.*