**James C. APPLETON and Derrick A. Ford, Appellants,**

v.

**UNITED STATES, Appellee.**

**Nos. 06–CF–457, 06–CF–656.**

District of Columbia Court of Appeals.

Argued Nov. 4, 2008.

Decided Nov. 19, 2009.

Shilpa S. Satoskar, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant Appleton.

Peter H. Meyers, Washington, DC, appointed by the court, for appellant Ford.

Chrisellen R. Kolb, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, and Roy W. McLeese III, Assistant United States Attorney, were on the brief, for appellee.

Before KRAMER and
BLACKBURNE–RIGSBY, Associate
Judges and NEBEKER, Senior Judge.

KRAMER, Associate Judge:

Appellants James Appleton and Derrick Ford were charged with various crimes related to the shooting of complainant, John Slade. At the conclusion of a jury trial, Appleton was found guilty of assault with intent to kill while armed ("AWIKWA"), assault with intent to rob while armed ("AWIRWA"), aggravated assault while armed ("AAWA"), and three counts of possession of a firearm during a crime of violence ("PFCV"). Ford was convicted of assault with a dangerous weapon ("ADW"), assault with intent to kill while armed ("AWIKWA"), aggravated assault while armed ("AAWA"), and three counts of possession of a firearm during a crime of violence ("PFCV"). Both appellants assert that the trial court erred by allowing the prosecutor to invoke witness fear in closing argument. Ford also argues that the trial court erred by giving a jury instruction on aiding and abetting that allowed conviction without proof of the required *mens rea,* and that there was insufficient evidence to support his convictions. Both appellants argue that their convictions for PFCV should merge, a position with which we agree. We affirm the convictions of each appellant, but remand to the trial court with directions to merge both Ford's and Appleton's convictions for PFCV.

## I.

On February 24, 2005, John Slade and Chris Colson went to visit a friend at 501 Edgewood Street in Northeast Washington. They left about forty-five minutes to an hour later. As Slade walked along—several feet behind Colson—he heard footsteps behind him, turned around and saw a man pull out a gun. Colson also turned at this point. The gunman said, "Give that shit up." Slade grabbed the gun and tried to wrest it out of the assailant's hand. While they were struggling, Slade heard the gunman say, "Shoot him." Slade looked to his right, saw a second man, heard a gunshot, realized that he had been shot in the leg and fell to the ground. While trying to straighten his wounded leg, he heard more shooting, looked up, saw a gun pointed at him and was shot approximately five times in the stomach by the person with whom he had been struggling. The shooter took no property from Slade.

At trial, Colson testified that he had seen Slade "tussling with somebody," heard some gunshots and "got out of there." He claimed that he could not recall two men being near them, but the government impeached him with his grand jury testimony, which was also admitted as substantive evidence pursuant to D.C.Code § 14–102 (2001).[1] Colson had testified before the grand jury that Slade was walking behind him singing, but had stopped singing when two men wearing dark clothes appeared beside him.

At trial, Slade, who admitted that he did not want to testify and had to be arrested to ensure his appearance at trial, testified that he was not able to get a good look at the person who shot him. He too was impeached pursuant to D.C.Code § 14–102

---

1. D.C.Code § 14–102 provides in part that "[a] statement is not hearsay if the declarant testifies at trial or hearing and is subject to cross-examination concerning the statement and the statement is (1) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding [such as a grand jury] or in a deposition.... Such prior statements are substantive evidence."

with his grand jury testimony, where he testified that "the one who shot me in my stomach, I seen his face. Me and him was staring like eye to eye when we were wrestling," and that "when he ran up on me and when me and him started wrestling his hood fell off his head, so I could see his face clearly," and further that "[t]he whole time I was wrestling, I seen his face. When I was on the ground, I looked up. When he hopped on top of me to shoot me in the stomach, I seen his face."[2]

Fifteen-year-old Ulysses Delaney testified that he saw the events surrounding the shooting from the lobby of 501 Edgewood Street, Northeast. Delaney recognized both appellants from playing basketball in the neighborhood. Delaney saw two men he did not recognize leave the building and then saw appellants coming up the walkway. Appellants joined approximately ten people on the steps. Appleton "put a ski mask on his face" and took out a gun "from his waist." Appellants then walked off, "following 2 people." Delaney heard three gun shots about a minute later and appellants "ran very quickly" past Delaney about thirty or forty seconds later.

While Slade was in the hospital recovering from his injuries, Detective Kenneth Goldberg interviewed him about the shooting. Goldberg testified that Slade was coherent and able to answer questions during the interview. He showed Slade a photo array of nine pictures, including Appleton, and Slade identified Appleton as the shooter. Goldberg did not show Slade an array with Ford's picture because Slade said he would be unable to identify the second individual.

At trial, Slade testified that when Detective Goldberg interviewed him at the hospital about the shooting, he was "doped up from all the drugs they were giving [him]," and Goldberg showed him at least twenty photographs and instructed him to pick five. Slade also testified that the signature on the viewing sheet was not his writing. Slade was again impeached with his grand jury testimony, which was also admitted as substantive evidence, that he had properly identified the person who shot him to Goldberg.

No shell casings or other physical evidence were found at the scene, but when the police executed a search warrant at Appleton's home, they found a loaded firearm[3] and clothing, including a black skull cap and a black and gray North Face coat.

After his arrest, Appleton gave a videotaped statement to the police, in which he admitted his role in a shooting on a cold, snowy night in the area of 501 Edgewood Street, Northeast. He said that the shooting took place "last week sometime."[4] Appleton claimed that he acted alone and, though he knew Ford, denied that he was friends with him and said he "wouldn't be caught dead with [Ford]." He said that he saw some people from the 640 Crew,[5] a

2. At trial, Slade claimed he "was told to say that." When confronted with other portions of his grand jury testimony, Slade stated that, "[i]f it's written down in there, then it should be."

3. The gun was a 9mm semi-automatic weapon, which would eject shell casings after it was fired.

4. In an effort to show that the shooting to which Appleton admitted was on a night oth-er than February 24, 2005, his counsel asked the court to take judicial notice that on March 8, 2005, there had been a snowfall of 8/10 of an inch. On rebuttal, Detective Goldberg testified that there were no reported shootings or requests for ambulance assistance in the Edgewood area between March 6 and April 1, 2005.

5. Slade and Colson denied any involvement with the 640 Crew.

gang with whom the Edgewood neighborhood was "beefing." The two men he saw were wearing black jackets. One of the men "[came] up on" Appleton and put him in an "L." Appleton struggled with one of the men and had the gun with him that the police recovered from his home. Appleton pulled his gun out and shot Slade. The man who was not shot ran away. The man who was shot was tall, about the height of a basketball player, and wore a black North Face jacket.

Ford was arrested on June 17, 2005, when a police officer found him asleep in a hallway of the Edgewood apartments. The police officer told Ford that he was under arrest on a warrant in connection with the February 24, 2005 robbery and assault at the Edgewood apartments. After being brought down to the lobby for transport, Ford fled from police with his hands cuffed behind his back. He ran about three blocks before officers apprehended him.

During the closing argument, the prosecutor told the jury that Slade's trial testimony was not to be believed:

He might have tried to tell you that he didn't see who shot him, but the evidence shows otherwise. And I warned you in opening statement that he wasn't going to be happy about being here. And he told you himself that he didn't want to be here and that he wasn't happy about having to come to court to testify.

And really, when you think about it, can you blame him? He's 19 years old, and he's having to come to court to sit in a room and testify about the man—the men who shot him, about James Chester Appleton and Derrick Ford. And he's got to sit on that witness stand, not very far away from those same men who shot him and left him there on February 24, 2005.

Appleton's counsel objected and moved to strike on the ground that the statement was prejudicial, but the court denied the objection.

The trial court gave the following instructions on aiding and abetting:

Any person who in some way intentionally participates in the commission of a crime can be found guilty as an aider and abettor or as a principal offender. It makes no difference which label you attach. The person is as guilty of a crime as he would be if he had personally committed each of the acts that make up the crime.

To find that the defendant aided and abetted in committing a crime you must find that the defendant knowingly associated himself with the commission of the crime, that he participated in the crime as something he wished to bring about, and that he intended by his actions to make it succeed.

## II.

Appellants contend that the trial court committed reversible error by allowing the prosecutor to argue in closing that Slade disavowed his grand jury testimony at trial because he had to sit "not very far away from those . . . men who shot him and left him there on February 24, 2005." Ford also individually argues that his convictions should be reversed because (1) the trial court committed reversible error by giving a jury instruction on aiding and abetting that allowed conviction without proof of the required *mens rea* and (2) there was insufficient evidence to support his convictions. Both appellants also argue that each of their three PFCV convictions should be merged.

### A. Invocation of Witness Fear

Appellants contend that the trial court erred by allowing the government to argue

in closing that Slade testified differently at trial than he did at the grand jury because appellants were present at trial. Appellants argue that this was an improper invocation of witness fear by the prosecutor.

When comments by the prosecutor are allegedly improper, we review to determine whether the trial court abused its discretion or committed legal error by allowing them. *Irick v. United States,* 565 A.2d 26, 33 (D.C.1989). If improper comments were allowed, reversal is required unless we can say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Murray v. United States,* 855 A.2d 1126, 1134 (D.C. 2004) (quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). While Appleton objected to the prosecutor's closing argument during trial, Ford did not, so the government and Ford agree that his claim is reviewed for plain error. *See Clayborne v. United States,* 751 A.2d 956, 968 (D.C.2000); *Thacker v. United States,* 599 A.2d 52, 59 (D.C.1991).

Slade changed his story between the grand jury and the trial, especially in regard to his identification of Appleton. Slade also admitted that he did not want to testify at the trial. In the closing argument, the government suggested that Slade's reluctance to testify and changed story were understandable because:

> He's 19 years old, and he's having to come to court to sit in a room and testify about the man—the men who shot him, about James Chester Appleton and Derrick Ford. And he's got to sit on that witness stand, not very far away from those same men who shot him and left him there on February 24, 2005.

"[E]vidence concerning a witness's fear tends to be prejudicial because it suggests the witness fears reprisal at the hands of the defendant or his associates if [ ] he testifies." *Simpson v. United States,* 877 A.2d 1045, 1048 (D.C.2005) (citations omitted). Such evidence "appeals to the passions of the jury and may cause the jury to base its decision on something other than the rule of law." *Murray, supra,* 855 A.2d at 1132 (citations omitted). "Absent a factual basis for such a comment by the prosecutor, our case law has been strict in stating that suggestions of fear are forbidden." *Simpson, supra,* 877 A.2d at 1048. "Evidence concerning the fear of a witness, however, may be admissible where the witness has given conflicting statements." *Mercer v. United States,* 724 A.2d 1176, 1184 (D.C.1999).

Although the prosecutor's statement may suggest that Slade was afraid of appellants, it was a more subtle allusion to witness fear than prosecutorial statements that have been found improper in the past. In *Simpson, supra,* a witness named Harold Hymes–Brown testified that he saw the defendant shoot at the victim, but he was impeached with statements he had previously made to the defendant's Public Defender Service investigators, in which he said he was elsewhere at the time of the shooting. 877 A.2d at 1047. The prosecution explained Hymes's inconsistencies in the closing argument:

> Think about it from Mr. Hymes's perspective. This is a 17-year-old man, . . . he is approached by this man. . . . What do you think [Hymes] is going to tell him? Yeah, I saw that man you represent murder somebody. I am going to put myself out here so that now you can tell him and everyone that you will know what I said? No. . . . Why wouldn't he want to tell Mr. Simpson's lawyer and investigator what he really saw? Maybe he might have been a little afraid.

*Id.* at 1048. The court held that this argument was improper because it "suggested, almost expressly, that Hymes had lied to the defense investigator out of fear of Simpson.... Given the way the prosecutor expressed it, no possible source of Hymes's fear other than Simpson was readily inferable by the jury." *Id.*

In *Murray, supra,* the defendants argued in closing argument that several witnesses who were admittedly reluctant to testify may have been pressured by the police to falsely incriminate the defendants. 855 A.2d at 1131. In rebuttal, the prosecution asked:

> Is it reasonable to assume that these people [the witnesses] were scared, that these people did not want to testify because they're scared and if that is reasonable to assume, who would they be scared of? If they're scared of coming into this courtroom, if they don't want to come into this courtroom and take that stand in front of these three people because they're scared, then who are they scared of? Those three people. Right? Why else would they be reluctant?

*Id.* One witness had testified that he had been threatened and beaten by the defendants, and the court stated that the evidence "supported a reasonable inference that [he] was still frightened of appellants...." *Id.* at 1132. As to the other two witnesses, however, there was no evidence which allowed a fair inference that they were afraid of or had reason to fear the appellants, and one had testified that she was reluctant to testify because the appellants were "like family" to her. *Id.* at 1133. "Sweeping them into the category of witnesses who were afraid of appellants was therefore a plain case of introducing unsubstantiated fear of ... reprisal from [the] defendants, thereby inviting conviction based on [the jury's] aversion [to such intimidation]." *Id.* (citations and internal quotation marks omitted). Similarly, a prosecutor acted improperly when he stated that a witness was afraid to testify although the record did not support that the witness was actually afraid. *Gordon v. United States,* 783 A.2d 575, 589–90 (D.C.2001).

Appellants also rely on cases that involve admission of witness testimony regarding fear. The testimony found to be inadmissible in these cases specifically mentioned the witness's fear. For example, the direct examination of one government witness who was reluctant to testify in a manner consistent with her grand jury testimony proceeded as follows:

> Q: You don't really want to say what you saw in front of these people; do you?
>
> A: Lord of mercy. What do you think, Oliver?
>
> . . .
>
> Q: [W]hy is it that you don't want to say the things that you saw?
>
> A: Let's trade places then, then you will know why. What I have been crying about all week? So stupid. You know why. I live right down the street from these people. I am scared for my life.

*Id.* at 585. The court, which found that this testimony was improper, noted that it was "extremely emotional testimony that was without relevance to the specific charges faced by the appellants in this case." *Id.* at 588. In *Mercer, supra,* the court found that various testimony elicited from witnesses was improperly admitted, including a statement that a witness was not happy about testifying "[b]ecause [she] could leave here today and y'all might never see [her] again." 724 A.2d at 1186. It was also improper for the prosecutor to ask witnesses about people standing at the back of the courtroom who were from the same neighborhood as the defendants, be-

cause it "suggests that because these imposing figures in the back of the courtroom were somehow connected to [defendants], [defendants] must need their presence to intimidate witnesses because they are guilty." *Id.* at 1187.

The prosecutor's statement in this case is not nearly as prejudicial or suggestive as the comments that have been found improper in previous cases. In fact, the comments made here are very similar to comments found proper in *Simpson, supra,* in which the prosecutor stated in the closing argument that when a witness testified at trial, "he didn't want to tell what he saw or heard from this man [Simpson]. Because this man, unlike in the grand jury, this man wasn't there." 877 A.2d at 1048. The court noted that this comment

> was merely a recognition of the possibility that, in this particular case, confrontation might not produce the more credible testimony.... [T]he comment merely stated the obvious to the jurors and constituted a reasonable inference from the evidence. The jury was presented with two conflicting accounts, both under oath, and each admitted as substantive evidence. Under the particular circumstances of this case, it was not an abuse of discretion for the trial judge to allow the prosecutor to suggest that [the witness's] prior testimony should be considered more reliable, in part because it was given outside the presence of the defendant.

*Id.* at 1049–50 (citations, internal quotation marks and footnote omitted). Here, the prosecutor did not say that Slade was afraid of appellants. He presented an explanation of why Slade changed his story by noting that appellants were not present at the grand jury and were present at the trial. Our case law on improper invocations of witness fear does not forbid this type of statement. "Common sense tells

us that in certain circumstances, face-to-face confrontation between the witness and defendant may have the effect of *inhibiting* the truth from emerging." *Id.* at 1049. The prosecutor's statement was nothing more than a reasonable inference which a basis in the record. Thus, the trial court did not err in permitting the government to make this statement.

### B. Jury Instruction on Aiding and Abetting

■ Ford also argues that the jury instruction on aiding and abetting was improper because it allowed the jury to convict him without proof that he possessed the required intent to commit the offenses. Where the question of whether a jury instruction was proper is a legal question, as it is here, we review the instruction *de novo. See Wilson–Bey v. United States,* 903 A.2d 818, 827 (D.C.2006) (en banc). In this case, although Ford objected to the aiding and abetting jury instruction on the ground that insufficient evidence had been presented to support a theory of aiding and abetting, he failed to argue that the substance of the jury instruction was improper. Accordingly, plain error is the standard on appeal. *Wheeler v. United States,* 930 A.2d 232, 240 (D.C.2007).

■ Any instruction on aiding and abetting must make clear that a defendant needs to have the *mens rea* required of the underlying crime in order to be convicted of the crime as an aider and abettor. *Carter v. United States,* 957 A.2d 9, 19 (D.C. 2008) ("where a specific *mens rea* is an element of a criminal offense, a defendant [tried as an aider and abettor] must have had that *mens rea* himself to be guilty of that offense.") (citations omitted). Accordingly, jury instructions that hold a defendant liable as an aider and abettor for "the natural and probable consequences of the crime in which [he] intentionally partici-

pates" are not allowed, because they enable the jury to convict without finding that the defendant had the required *mens rea.* *Wilson–Bey, supra,* 903 A.2d at 822 ("natural and probable consequences" instruction was erroneous in prosecution for premeditated murder); *see also Walters v. United States,* 940 A.2d 101, 102 (D.C. 2007) ("the *Wilson–Bey* holding applies equally to the crimes of robbery and assault with intent to rob . . . .").

Here, there was no "natural and probable consequences" language in the jury instruction. Ford does not explain what language in the jury instructions raises similar concerns to those stated in *Wilson–Bey* and its progeny. The jury was instructed that to convict the defendant for aiding and abetting, they had to find that he "knowingly associated himself with the commission of the crime, that he participated in the crime as something he wished to bring about, and that he intended by his actions to make it succeed." Ford points to no authority that supports his argument that this language is problematic, and we see no reason why this instruction would allow a jury to convict a defendant under an aiding and abetting theory without finding that he had the required *mens rea.* Accordingly, the instruction was not erroneous.

### C. Sufficiency of the Evidence

■ Ford also argues that the evidence was insufficient to support his convictions under an aiding and abetting theory because there was not sufficient evidence that Ford had the required *mens rea.* Sufficiency of the evidence claims are reviewed *de novo.* *United States v. Bamiduro,* 718 A.2d 547 (D.C. 1998). "In reviewing for sufficiency of the evidence, the court must examine the evidence in the light most favorable to the government and inquire whether a reasonable person could find guilt beyond a reasonable doubt." *Kelly v. United States,* 639 A.2d 86, 89–90 (D.C.1994). To establish aiding and abetting, the government must establish "(1) that an offense was committed by someone; (2) that the accused assisted or participated in its commission; and (3) that he did so with guilty knowledge." *Wilson–Bey v. United States,* 871 A.2d 1155, 1163–64 (D.C.2005).

■ Viewed in the light most favorable to the government, the evidence is sufficient to support Ford's conviction under an aiding and abetting theory. The evidence establishes that Slade was shot and that Ford participated in the shooting with guilty knowledge. Taken together, the testimony from Slade and Delaney establishes that Ford not only participated in the assault, but that he fired the first shot at Slade. Although Ford argues that the government did not introduce sufficient evidence that he had the required *mens rea* to be convicted of the charged offenses, the evidence was sufficient to support that Ford participated in the assault on Slade with guilty knowledge.

### D. Merger

■ Merger issues are reviewed *de novo.* *Roy v. United States,* 871 A.2d 498, 510 (D.C.2005). Appellants argue that each of their three PFCV convictions should merge because merger of multiple PFCV convictions is proper if "they [arose] out of a defendant's uninterrupted possession of a single weapon during a single act of violence." *Matthews v. United States,* 892 A.2d 1100, 1106 (D.C.2006). The government does not argue otherwise. Each of appellant's three PFCV convictions must be merged.

### III. Conclusion

There was no error related to the prosecutor's closing argument or the aiding and

abetting instruction, and the evidence was sufficient to support Ford's conviction. Accordingly, appellants' convictions are affirmed. Additionally, each appellant's three PFCV convictions are merged.

*Affirmed in part and remanded in part, with instructions to merge appellants' PFCV convictions.*