# District of Columbia
# Court of Appeals

**No. 15-CF-277**

CHRISTOPHER T. HOLMES,



FILED

JUL **21** 2016

DISTRICT OF COLUMBIA
COURT OF APPEALS

Appellant,

v.                                                                    **CF1-15515-12**

UNITED STATES,

Appellee.

On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE: THOMPSON and MCLEESE, *Associate Judge*; and KING, *Senior Judge*.

## J U D G M E N T

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the appellant's convictions are affirmed.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated: July 21, 2016.

Opinion by Senior Judge Warren R. King.

Opinion concurring in part and dissenting in part by Associate Judge Roy W. McLeese.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CF-277

CHRISTOPHER T. HOLMES, APPELLANT,

v.

UNITED STATES, APPELLEE.

FILED 7/21/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court of the
District of Columbia
(CF1-15515-12)

(Hon. Rhonda Reid Winston, Trial Judge)

(Argued April 7, 2016                    Decided July 21, 2016)

*Peters H. Meyers* for appellant.

*Nicholas P. Coleman*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney, and *Elizabeth Trosman*, Assistant United States Attorney, were on the brief, for appellee.

Before THOMPSON and MCLEESE, *Associate Judges*, and KING, *Senior Judge*.

Opinion for the court by *Senior Judge* KING.

Opinion by *Associate Judge* MCLEESE, concurring in part and dissenting in part, at page 22.

KING, *Senior Judge*: Following a jury trial, appellant Christopher Holmes

was convicted of second degree murder while armed and possession of a firearm

during a crime of violence.  On appeal, Holmes argues that the trial court erred in admitting witness testimony about another crime that Holmes reportedly committed and about witness fear.  He also argues that the trial court erred in denying his motion for a mistrial after a prospective defense witness yelled outside of the courtroom that her life was in danger.  For the reasons stated below, we affirm.

## I.

The charges against appellant Christopher Holmes arose from the fatal shooting of David Tucker outside a barbershop located in the Southeast quadrant of the District of Columbia in October 2008.  On the day of the shooting, Holmes walked into the Classic Kutz Barbershop on 22nd Street.  Larocko Miles, one of the barbers, testified that he saw a young man, later identified as Holmes, come into the barbershop wearing an "Elmer Fudd"-style hat with earflaps.  Tucker, who was sitting inside the barbershop, told Holmes, "[W]hat you coming in here for[?] [A]in't nobody in here for you to rob."  Holmes replied, "[M]an, you say anything[,]" and started to leave.  As Holmes was leaving, Tucker stated, "[Y]ou're going to do something[,] young'un[?]"  Holmes replied, "[N]aw, I ain't going to do nothing."  Although Holmes and Tucker exchanged more words, all

Miles could discern was Tucker saying to Holmes, twice, "[W]hat you say, young'un[?]" Tucker then walked out of the barbershop after Holmes.

Akeem Young, who had known Holmes and Tucker for many years, was standing outside of the barbershop when Holmes came out saying, "[T]his n****r got me f**ked up." Tucker then "storm[ed]" out of the barbershop and approached Holmes, grabbed him by the "shoulder and neck area," and told him to "get the hell away from the barbershop." A struggle ensued between the two men during which Tucker pushed Holmes into the street. Holmes pulled out what appeared to Young to be a .40-caliber gun and pointed it at Tucker. Young began to run away and heard Tucker say to Holmes, "[W]hat you going to do[?] You going to shoot me out here in public, [in] broad day light?" Seconds later, Young heard gunshots.

Miles, who heard three gunshots after Tucker went outside, saw Tucker come back into the barbershop and fall to the floor. Lee Wade, who was inside the barbershop, also heard gunshots and saw the victim fall in through the front door. Tucker later died from a single gunshot that had penetrated his heart.

Holmes was indicted on September 5, 2012, for one count of first-degree premeditated murder while armed,[1] one count of possession of a firearm during crime of violence (PFCV),[2] and one count of carrying a pistol without a license (CPWL).[3] Before trial, the trial court granted Holmes's unopposed motion to dismiss the CPWL count. Following a jury trial, Holmes was acquitted of first-degree premeditated murder while armed and its accompanying PFCV charge, but found guilty of the lesser-included offenses of second-degree murder while armed and its accompanying PFCV charge. This appeal followed.

## II.

On appeal, Holmes argues that the trial court erred in allowing Nicholas Proctor, the victim of a robbery, to testify that prior to the shooting he had told Tucker that the perpetrator of the robbery "might have been someone named Bar Beast," which the defense stipulated was Holmes's nickname.

---

[1] D.C. Code §§ 22-2101, -4502 (2012 Repl.).

[2] D.C. Code § 22-4504 (b) (2012 Repl.).

[3] D.C. Code § 22-4504 (a) (2012 Repl.).

In general, evidence of other uncharged crimes is inadmissible if it is offered to prove a defendant's propensity to commit the charged crime. *Drew v. United States*, 331 F.2d 85, 89–90 (D.C. Cir. 1964). Other crimes evidence is admissible, however, if it is "necessary to place the charged crime in an understandable context." *Johnson v. United States*, 683 A.2d 1087, 1098 (D.C. 1996) (en banc); *see also Toliver v. United States*, 468 A.2d 958, 961 (D.C. 1983). Such evidence may still be excluded if its probative value is substantially outweighed by danger of unfair prejudice. *Johnson*, *supra*, 683 A.2d at 1100–01. "[T]he evaluation and weighing of evidence for relevance and potential prejudice is quintessentially a discretionary function of the trial court, and we owe a great degree of deference to its decision." *Id*. at 1095.

Here, Proctor's testimony was not admitted for the purposes of proving Holmes's criminal propensity; rather it was offered to explain the confrontation between Holmes and Tucker. We conclude that not only did the trial court exercise its proper discretion, the court did so with caution to prevent potential prejudice from the testimony. More specifically, at the pretrial hearing on the matter, the court found that Proctor's testimony was relevant to help explain Tucker's accusatory statements toward Holmes in the barbershop, giving context to the animosity between the two men leading up to the shooting. The trial court

twice expressed its concern regarding the potential prejudice against Holmes, and, thus, limited Proctor's testimony to only what he had told Tucker prior to the shooting, not why Proctor thought Holmes might have been the perpetrator. For reasons stated below, we are satisfied that such testimony was admissible as *Johnson* evidence given the circumstances here and that the trial court acted properly to "control the development and use of the evidence at trial" in minimizing the testimony's potential prejudice. *Id*. at 1101.

Holmes argues that Proctor's testimony was not necessary to place the shooting in an understandable context because Tucker was just "trash talking" when he told Holmes, "[A]in't nobody in here for you to rob." This argument fails because evidence at trial showed that the two men had a close relationship prior to the shooting, with Tucker having treated Holmes like a "son," including buying him clothes and giving him money. With this history between Holmes and Tucker, Proctor's testimony was necessary to explain why Tucker would now accuse Holmes of robbery. Deprived of Proctor's testimony, the jury would have been left uninformed and unable to bridge the gap between the men's previous close relationship and Tucker's accusation against Holmes which escalated to angry exchanges and the eventual fatal shooting. *See, e.g.*, *Brown v. United States*, 934 A.2d 930, 940–41 (D.C. 2007) (evidence of defendant's uncharged possession of

illegal drugs was admissible to help explain the reason why defendant and codefendant, as part of a turf war over drugs, would approach two strangers and immediately shoot them in the back); *Bonhart v. United States*, 691 A.2d 160 (D.C. 1997) (evidence that defendant sold drugs to victim for years, supplied crack cocaine to victim and roommate two days before fire, and had threatened to burn down apartment building if victim did not pay him for recent drug sale was admissible in prosecution for arson and murder to put arson in context).

Holmes also contends that the probative value of Proctor's testimony was substantially outweighed by the danger of unfair prejudice. This argument is without merit. The record on appeal shows that the trial court twice expressed its concern regarding the potential prejudice of Proctor's testimony, and, as a precautionary measure, limited the testimony to only what Proctor had told Tucker prior to the shooting. *See Johnson*, *supra*, 683 A.2d at 1104–05 & n.22 (evidence of uncharged murders was properly admitted because it was not offered to prove the defendant's criminal disposition but as identity evidence and direct evidence of the charged crimes, also the trial court took appropriate actions to minimize undue prejudice by denying the prosecutor's request to admit an autopsy photo and distressed 911 call reporting the murders). The jury was allowed to only hear that Proctor had told Tucker the robber "might have been someone named Bar Beast,"

not why and how Proctor arrived at that conclusion. Furthermore, the government, in its closing argument, limited its use of this testimony to only explaining Tucker's statements:

> There's nobody in here for you to rob is a pretty specific thing to say to somebody. Now ask yourself who did Mr. Tucker have a reason to say those words to and now at the end of this trial you know the answer to that question too. Mr. Tucker had a reason to say those words to Bar Beast, the Defendant, Christopher Holmes. What was that reason? Mr. Tucker thought that Bar Beast had robbed Nicholas Proctor, a long-time friend of Mr. Tucker. Why did Mr. Tucker think that? Because that's what Mr. Proctor told him a few weeks before the murder.

On this record, we conclude that any potential prejudice was minimized by the court's effort to limit Proctor's testimony, ensuring that evidence was offered only to explain Tucker's accusatory statements toward Holmes, not to prove Holmes's criminal propensity. Accordingly, we reject Holmes's challenge to the trial court's admission of Proctor's testimony.

**III.**

Next, Holmes argues that the trial court erred in admitting fear testimony given by two government witnesses: Akeem Young and Carlton Clemons. Holmes maintains that the probative value of this fear evidence was substantially outweighed by the danger of unfair prejudice, especially because the government, in its closing arguments, focused on both the witnesses' generalized fear of being involved in a homicide case and Young's specific fear of the shooter.

*Additional Background Information*

At trial, Young admitted to not telling all that he knew about the shooting to the grand jury, including that he saw Holmes pull out a gun and point it at the victim just before he was shot. He testified that he did not "want to be involved" in any "conflicts[,]" because he had "a lot of family in the streets in Washington, D.C." Young also described two incidents where Holmes warned Young not to talk about what he saw during the shooting. During cross-examination, Young agreed with defense counsel that Holmes never specifically threatened him.

Clemons, Young's cousin, was an extremely reluctant witness who had to be arrested and forcibly brought to court to testify in this case. At the grand jury hearing, he acknowledged that he was "concerned for [his] safety" and did not want to "be involved" in the case. At trial, Clemons testified that he and Young were at the barbershop trying to sell Young's television set on the day of the shooting. Clemons, however, claimed that he suffered a concussion and, thus, was having difficulty recalling information about the shooting. Clemons was then impeached with his grand-jury testimony in which he stated that a man whom Young pointed out to him and identified as "Bar Beast" came into the barbershop. After Clemons left the barbershop, he saw the victim and Bar Beast, who was wearing a "big boofy [sic] looking hat" that could be "pulled down over [one's] ears[,]" struggle with each other. At this point, Young told Clemons that they needed to leave. Clemons heard gunshots and saw Bar Beast holding what appeared to be a black semiautomatic pistol. In response to the government's question about his failure to appear for trial, Clemons indicated that he did not want to be "involved in a homicide case," and that "anybody that[] [was] involved in something like this would be fearful of [sic] their life."

In closing, the government argued that the reason Young initially failed to tell the truth (*i.e.*, that Young saw Holmes shoot Tucker "in broad daylight in the

middle of the street") was that Young "was scared"; Young "kn[e]w[] the shooter[,]" and "live[d] two blocks from where th[e] shooting happened." The government also observed that "the shooter kn[e]w[] [] Young, [and] kn[e]w he was out there[,]" as demonstrated by the fact that Holmes told Young "twice to keep his mouth shut about this case." The government told the jury, "[I]magine what this must have been like for [] Young," who was "17, 18 years old" at the time, and thus was "scared" when he came to the grand jury, and did not "want to be involved" in the case. With regards to Clemons, the government argued that Clemons did not tell the police what he knew because he was "kind of scared" and was "afraid for a different reason from [] Young," as Clemons was not from the neighborhood and did not "know th[o]se guys." It was, however, "the same fear, the same desire not to be involved."

### *Discussion*

Recognizing that witness fear evidence "tends to be prejudicial because it suggests the witness fears reprisal at the hands of the defendant or his associates if she [or he] testifies[,]" we have held that such evidence may nevertheless be admissible where the witness has given conflicting statements. *Mercer v. United States*, 724 A.2d 1176, 1184 (D.C. 1999) (quoting *McClellan v. United States*, 706

A.2d 542, 551 (D.C. 1997)).   More specifically, "evidence of a witness'
'generalized fear,' not specifically a fear of the defendant, may be admissible, in
the court's discretion, to show bias or motive when the witness has previously
withheld information or makes conflicting statements." *Parker v. United States*,
797 A.2d 1245, 1249 (D.C. 2002).   The admissibility of such evidence is
determined "by looking to the specificity of the fear, *i.e.*, by considering whether
the threat is specifically linked to the defendant." *Id*. at 1249.

Here, Clemons's fear testimony was admissible to explain his adamant
refusal to testify at trial and his prior conflicting statements.  We are satisfied that
Clemons's fear testimony was "generalized" fear, and thus, did not unduly
prejudice Holmes.  First, Clemons admitted that he did not live in the area and,
thus, as the government suggested, he did not know the men involved in the
shooting.  Second, at no point during his testimony did Clemons indicate that he
was specifically fearful of Holmes or that he was threatened by Holmes or by
anyone on his behalf.  In fact, the record suggests that Clemons was afraid to
testify in general because this was "a homicide case," which understandably could
provoke fear in the witness whether or not he knew or was threatened by the
perpetrator.  In other words, Clemons's fear had no direct connection to Holmes
that could result in undue prejudice.  Accordingly, we find no abuse of discretion

in allowing Clemons's fear testimony. *See, e.g.*, *Gordon v. United States*, 783 A.2d 575, 587 (D.C. 2001) (questions about witness's general fears were proper, but not questions about witness's fear of "these people," *i.e.*, the defendants); *Clayborne v. United States*, 751 A.2d 956, 964 (D.C. 2000) (general question about "snitching" not linked to defendant was permissible); *Carter v. United States*, 614 A.2d 913, 917–918 (D.C. 1992) (question about a general threat from "other people" on "the street" was proper, but question about a more specific threat from the defendant would be improper).

Young's testimony, on the other hand, presented a more complicated set of circumstances as it was slightly more specific in relation to Holmes. Young knew the victim and Holmes well and vice versa. They lived in the same neighborhood and Young's family also lived in the District. These facts were highly probative as they helped explain how Young could have been afraid of the potential negative consequences of testifying against Holmes at trial, which may have motivated Young to withhold information initially. Young also testified that Holmes twice indicated to Young that he should keep quiet.[4] While we have held that it is an

---

[4] Sometime after the shooting, Young was walking down the street when he saw Holmes in a car; Holmes put his finger to his lips, which Young understood to mean that he should not "run[] [his] mouth." Subsequently, when Young was incarcerated at the Oak Hill juvenile detention center, he saw Holmes, who was

(continued…)

abuse of discretion to admit "evidence of threats solely to go to the general credibility or bias of the witness[,]" such evidence is admissible to "explain specific behavior of the witness, such as inconsistent statements, delay in testifying, or unusual courtroom demeanor." *Mercer*, *supra*, 724 A.2d at 1184. On this record, we are content that Young's testimony regarding Holmes's warnings, perceived as threats or not, was admissible as highly probative evidence in explaining Young's reluctance to testify and his prior inconsistent statements. Also, Young's testimony was not directed at Holmes in such a way that would cause the jury to believe Holmes had threated or intimidated Young in order to prevent him from testifying. All in all, Young admitted during cross-examination that Holmes never threatened him, indicating that Young did not take Holmes's nonverbal and verbal warnings as threats. Having found no error in the court's decision to admit fear testimony from Young and Clemons, we reject Holmes's challenge on this ground.

_____
(…continued)
apparently visiting someone else. Young ran up to greet Holmes, but Holmes told him to "be quiet about that[,]" which Young thought was referring to what he saw outside of the barbershop. However, Young admitted that Holmes had never threatened him.

## IV.

Lastly, Holmes argues that the trial court erred in denying his motion for mistrial following a prospective defense witness's verbal outburst outside of the courtroom. On appeal, Holmes argues, for the first time, that in the alternative the trial court should have conducted an investigation into whether the jury heard and was affected by the outburst before denying the mistrial motion. For the foregoing reasons, we find no reversible errors in the trial court's decision.

### *Additional Background information*

During cross-examination of a government witness, a woman engaged in a loud verbal outburst outside of the courtroom. The transcript of the proceeding only reflects a pause due to interruption. Defense counsel continued his cross-examination and waited until after lunch recess to raise the issue with the court and moved for a mistrial on the ground of prejudice.[5] Counsel asked the record to reflect that the witness "was screaming" that "there are people in this room. My

---

[5] After defense counsel finished his cross-examination of the government witness, another witness took the stand and finished his testimony before the court adjourned for lunch.

life is in danger," and that "that she felt threatened." The outburst, according to defense counsel, "went on for some time." The woman's name was mentioned to the jury during *voir dire* as a prospective defense witness. The record does not indicate that she was actually present and seen by the jury at that time and Holmes does not claim in his briefs on appeal that she was present. Prior to the outburst, defense counsel informed the trial judge that he may not call the woman to testify and the woman ultimately never testified.

The prosecutor argued that because the outburst took place outside of the courtroom[6] "the jury would have no reason to believe that the incident in the hallway was in any way connected to anything that was happening in [the] courtroom," and that the outburst was not "so loud that the jury could not hear the questions [defense counsel] was asking or the answers the witness was giving." The trial court stated that it did not hear all that defense counsel claimed to have heard but acknowledged that it heard someone say something "about her life being in danger or something." Ultimately, the trial court denied the motion for mistrial because it was not clear whether the jury even heard the outburst or realized that it was a witness and "would have connected it to either side in this trial." Therefore,

---

[6] The woman was in the area between the outer and inner doors of the courtroom.

the court could not conclude that Holmes was prejudiced by the outburst. The court also noted defense counsel's equivocal representation about whether he planned to call this witness. When the trial resumed, the trial court did not instruct the jury to disregard the outburst. As noted above, this witness was never called to testify.

### *Discussion*

"The decision to order a mistrial is subject to the broad discretion of the trial court and our standard of review is deferential." *Gordon*, *supra*, 783 A.2d at 583. We are "only inclined to reverse 'in extreme situations threatening a miscarriage of justice.'"[7] *Id.* (quoting *Wright v. United States*, 637 A.2d 95, 100 (D.C. 1994)). In circumstances where "the impartiality of [the jury] has been plausibly called into question, it is the responsibility of the trial judge to hold a hearing to determine whether the allegation of bias has merit." *Tann v. United States*, 127 A.3d 400,

---

[7] The dissent cites to *Gordon*, *supra*, 783 A.2d at 586, 590, as an example where this court "emphasized the highly prejudicial effect of emotional outbursts reflecting witness fear." *Post* at 25. We note, however, that there are significant factual differences between that case and the case at bar. In *Gordon*, the witness tearfully testified at some length during the trial about her fear of the defendant, whereas here a woman yelled briefly outside of the courtroom and was never called to the stand to testify.

470 (D.C. 2015) (quoting *Medrano-Quiroz v. United States*, 705 A.2d 642, 649 (D.C. 1997)). Although a hearing is required and the government has the burden "to demonstrate that the [jury's] contact with extraneous information was harmless or non-prejudicial[,] the extent and type of the trial court's investigation into the improper contact are confided to the court's discretion and reviewable only for abuse." *Id.* (quoting *Hill v. United States*, 622 A.2d 680, 684 (D.C. 1993); *Leeper v. United States*, 579 A.2d 695, 699 (D.C. 1990)). "There is 'no per se rule that individual questioning of each juror is always required,' and 'the trial judge has broad discretion to fix the exact procedures by balancing the need to make a sufficient inquiry against the concern that the inquiry not create prejudicial effects by unduly magnifying the importance of an insignificant occurrence.'" *Id.* at 470–71 (quoting *Al-Mahdi v. United States*, 867 A.2d 1011, 1019 (D.C. 2005)).

*Tann* involved a defendant (Tann) who had an outburst in open court when the jury found him guilty of murders and conspiracy and his codefendants guilty of conspiracy but had yet to finish deliberations on their remaining charges.[8] *Tann*, *supra*, 127 A.3d at 469. Tann's codefendants moved for mistrial. When the jury

---

[8] Tann stated: "I don't see how I can get found guilty, and what type of court is this? I wasn't even there . . . . [N]owhere near . . . . I get found guilty and I'm innocent. God going to challenge y'all for this. I'll see y'all in heaven . . . . I'm innocent. How the f**k I get found guilty? . . . That's f**king–that's crazy." *Tann*, *supra*, 127 A.3d at 469.

resumed deliberations, the trial judge held a hearing on the facts surrounding Tann's outburst, and found that Tann's conduct was not violent or threatening to the jury despite his reference to the afterlife. Further, the court observed no reaction from the jury that constituted significant concern and, thus, denied the motion for mistrial. *Id.* at 470.

On appeal, Tann's codefendants argued that the trial court erred in denying a mistrial without conducting a *voir dire* because the jury might have convicted them for fear that if it found them not guilty, they would be free and able to carry out Tann's "threats." *Id.* at 471. This court, however, found that Tann's statements did not expressly implicate his codefendants in any way; the trial court gave a prompt curative instruction; and the jury did not contact the judge about the outburst to voice any sort of concern. *Id.* "[C]onsider[ing] the risk that further investigation would turn an insignificant matter in the jurors' minds into a significant one—a possibility that was well within the trial court's discretion to take into account," we held that the trial court did not err in denying the *voir dire* request and properly denied the motion for mistrial. *Id.*

Here, unlike in *Tann*, the outburst took place outside of the courtroom, and it was by no means clear that the jurors heard the outburst, understood exactly what

was said, or even saw the person making it. Even assuming the jury could hear the outburst, there was no evidence that any jurors could have drawn a connection, let alone with prejudice, to Holmes or the matter on trial before since this witness was never called to testify.

In any event, we hold that the trial court's subsequent colloquy with counsel was sufficient. Here, like in *Tann*, the trial judge was present and observed firsthand the situation and the jury's reaction.[9] *See Tann*, *supra*, 127 A.3d at 471 (holding that it was "crucial . . . that the trial judge actually observed Tann's outburst and viewed its effect (or lack thereof) on the jury when determining the correct course of action"). Even though the trial judge here did not give a curative instruction following the outburst or conduct a *voir dire*, we find no abuse of discretion as an instruction or *voir dire* would have, as the trial judge

---

[9] The dissent questions this finding and its significance under *Tann*, observing that "it is unclear whether the trial court saw the potential witness as she was screaming outside the courtroom" and that "the trial court may not have heard everything the potential witness screamed and did not observe the jurors' responses to the outburst." *Post* at 29. We respectfully disagree. The outburst took place during the cross-examination of another witness where all those involved in the trial—the judge, the jury, appellant and his counsel, and government counsel—were present. We think it is significant that the judge was in the courtroom with the jury and was able to hear the outburst and observe the jury's reaction, or lack thereof. The fact that the judge did not hear all that defense counsel claimed to have heard does not in and of itself negate the judge's "firsthand knowledge" of the situation nor undermine her assessment of any potential impact on the jury.

acknowledged, unnecessarily called the jury's attention to the outburst, especially after a significant amount of time had passed and the jury had no reason to connect the outburst to the trial or Holmes.

The dissent cites to *Tann* for the proposition that "[i]f a plausible concern about jury taint arises, the trial court must either grant a mistrial or take steps to ensure that the jury's ability to be impartial has not been undermined." *Post* at 27. The dissent further states that the trial court "was required either to grant a mistrial or to take other steps, such as giving a curative instruction or conducting a *voir dire* of the jury, to ensure that the jury's impartiality had not been undermined." *Post* at 28. We respectfully disagree as we do not think our decision in *Tann* goes that far. In fact, we said in that case that "[t]here is 'no per se rule that individual questioning of each juror is always required,' and 'the trial judge has broad discretion to fix the exact procedures by balancing the need to make a sufficient inquiry against the concern that the inquiry not create prejudicial effects by unduly magnifying the importance of an insignificant occurrence.'" *Tann*, *supra*, 127 A.3d at 470-71. The *Tann* court clearly emphasized the importance of the trial judge's broad discretion in situations like this where she would have to ensure the balance between inquiring into the possible impact on the jury and not drawing unnecessary and prejudicial attention to the outburst.

In addition, we think it is significant that defense counsel waited several hours before even raising the issue with the trial judge and never requested a curative instruction or asked the trial judge to conduct a *voir dire*. For all of these reasons, we hold that the trial court did not abuse its discretion in denying mistrial as there was no evidence showing that the outburst prejudiced Holmes in any way or presented an extreme situation "threatening a miscarriage of justice" *Gordon*, *supra*, 783 A.2d at 583.

## V.

For the foregoing reasons, Holmes's convictions are affirmed.

*So ordered*.

MCLEESE, *Associate Judge*, concurring in part and dissenting in part. I agree that the trial court did not abuse its discretion in admitting other-crimes evidence and witness-fear evidence. I therefore join Parts I, II, and III of the court's opinion. I respectfully dissent from Part IV of the court's opinion, in which

the court concludes that trial court permissibly took no steps to address an outburst outside of the courtroom during trial.

The trial transcript reflects that there was an interruption in the courtroom on the second day of trial. Defense counsel subsequently represented that a potential defense witness "in the back" had been screaming "there are people in this room. My life is in danger." Defense counsel also represented that the potential witness had said that she felt threatened and that "there's family here in this room." According to defense counsel, the incident went on for some time and caused defense counsel to stop during the cross-examination of a witness. Defense counsel further represented that he could see the potential witness's face through the courtroom door, that the jurors would also have been able to see the potential witness, and that some if not all of the jurors were looking in that direction. Expressing concern that the jurors might feel that someone had threatened the potential witness, defense counsel requested a mistrial.

The prosecutor opposed a mistrial, arguing that jurors would not have known who was screaming. The prosecutor also indicated that he had not heard as much of the outburst as defense counsel described, although the prosecutor

acknowledged that he had heard a woman's voice saying something about believing her life was in danger.

Describing the potential witness as having been loud, the trial court acknowledged having heard the potential witness say something about her life being in danger. The trial court further acknowledged that it did not know what the jurors might have seen or heard. No one suggested that the trial court conduct a voir dire of the jury or give a curative instruction, and the trial court did not take either step. Instead, the trial court denied the mistrial motion.

Outbursts such as the one in the present case "implicate[] a defendant's Sixth Amendment right to an impartial jury." *Tann v. United States*, 127 A.3d 400, 470 (D.C. 2015). According to defense counsel's representations, the jurors in this case likely heard, and may well have seen, a woman screaming right outside the courtroom door that her life was in danger and that "family" was in the courtroom. This is a murder case, and the jury heard testimony that several witnesses were afraid to testify. *Ante* at 9-14. Specifically, the day before the outburst at issue, one witness gave testimony indicating that he feared for his life. Almost immediately after the outburst, another witness implied that he was afraid for his family and described incidents in which Mr. Holmes had directed him to keep

quiet. Given that testimony, it would be quite natural for the jurors to infer that the screaming woman was a terrified potential witness. We have repeatedly emphasized the highly prejudicial effect of emotional outbursts reflecting witness fear. *See, e.g.*, *Gordon v. United States*, 783 A.2d 575, 586, 590 (D.C. 2001) ("[E]vidence concerning a witness'[s] fear tends to be extremely prejudicial because it appeals to the passions of the jury and may cause the jury to base its decision on something other than the rule of law."; reversing conviction, because witness's "highly emotional testimony that she feared for her life was erroneously admitted" and "the error was not harmless").

In my view, the outburst in this case raised a "plausibl[e]" concern that the jurors had been exposed to extrinsic information that could affect the jury's ability to be impartial. *Tann*, 127 A.3d at 470. Once such a concern arises, "it is the responsibility of the trial judge to hold a hearing" to address the concern. *Id.* At such a hearing, "it is the government's burden to demonstrate that the jury's contact with extraneous information was harmless or non-prejudicial." *Id.* (brackets and internal quotation marks omitted). "The evidence of record must justify a high degree of confidence that the likelihood of juror partiality has been rebutted. Otherwise, the court is obliged to declare a mistrial or grant other adequate relief." *Id.* (brackets, citation, and internal quotation marks omitted).

In this case, the trial court did nothing to assess or address the potentially prejudicial effect of the outburst. The trial court did not determine what the jurors heard and saw, did not inquire into whether the jurors' ability to be impartial had been affected, and did not instruct the jury to disregard the outburst. Thus, the trial court did not fulfill its obligation to "declare a mistrial or grant other adequate relief." *Tann*, 127 A.3d at 470 (internal quotation marks omitted). I have found no case from this jurisdiction in which a trial court took no steps at all in response to a comparable incident. To the contrary, in each such case that I have found, the trial court conducted an inquiry, gave a curative instruction, or did both. *See, e.g.*, *id.* at 470-71 (trial court gave curative instruction after defendant's outburst); *Hallman v. United States*, 410 A.2d 215, 217 (D.C. 1979) (trial court gave curative instruction after spectator was sobbing and weeping during opening statement); *Christian v. United States*, 394 A.2d 1, 21-23 (D.C. 1978) (trial court gave curative instruction after outburst from testifying witness); *Evans v. United States*, 392 A.2d 1015, 1025-26 (D.C. 1978) (trial court gave curative instruction after outburst from codefendant); *Hammond v. United States*, 345 A.2d 140, 141-42 (D.C. 1975) (trial court conducted voir dire and gave curative instruction after outburst by defendant and father outside courtroom); *cf. Commonwealth v. Tribblett*, 363 A.2d 1212, 1214-15 (Pa. Super. Ct. 1976) (affirming conviction despite outburst in which

spectator stood up and began screaming that defendant had threatened spectator's life; trial court gave immediate curative instruction).

The court's affirmance in this case rests on four principal considerations. First, the court reasons that mistrials are disfavored, that the trial court has broad discretion about whether a mistrial is required, and that the trial court also has broad discretion about how to handle concerns about jury taint. *Ante* at 17-18. Cases such as *Tann*, however, establish a limit on the scope of the trial court's discretion. If a plausible concern about jury taint arises, the trial court must either grant a mistrial or take steps to ensure that the jury's ability to be impartial has not been undermined. *See, e.g.*, *Tann*, 127 A.3d at 470. By failing to meet this requirement, the trial court in the present case abused its discretion.

Second, the court points out that it is unclear whether any juror either heard the potential witness's screaming about fearing for her life or connected those screams to this case. *Ante* at 19-20. Given that the trial court, defense counsel, and the prosecutor all heard the potential witness's screams and her reference to fearing for her life, there is little reason to doubt that one or more of the jurors did as well. More fundamentally, the court is placing the burden of uncertainty on the incorrect party. Defense counsel's representations about the outburst raised a

plausible concern about jury taint. Under our cases, the burden therefore was on the trial court or the prosecution to create a record demonstrating with a high degree of confidence that there was no basis for concern. No such record was created in this case. The trial court thus was required either to grant a mistrial or to take other steps, such as giving a curative instruction or conducting a voir dire of the jury, to ensure that the jury's impartiality had not been undermined.

Third, the court accurately points out that defense counsel did not request a curative instruction or a voir dire of the jury. *Ante* at 22. Although such a request would certainly have been helpful, our cases foreclose the idea that the absence of such a request is fatal to Mr. Holmes's claim. Rather, if a defendant seeks a mistrial based on a plausible concern about jury taint, the trial court must either grant the motion or otherwise adequately address the concern. *Tann*, 127 A.3d 470. Defense counsel's failure to request a curative instruction or voir dire of the jury does not eliminate the trial court's responsibility.

Fourth, the court relies heavily on *Tann*. *Ante* at 18-21. That reliance is misplaced. Rather than supporting affirmance in this case, *Tann* requires reversal. I first note one factual correction. The court states that, as in *Tann*, the trial court in this case "observed firsthand the situation and the jury's reaction." *Ante* at 20.

To the contrary, it is unclear whether the trial court saw the potential witness as she was screaming outside the courtroom. Moreover, the record indicates that the trial court may not have heard everything the potential witness screamed and did not observe the jurors' responses to the outburst. In fact, the trial court explicitly acknowledged that it did not know what the jurors might have seen or heard. A fact that we deemed "crucial" in *Tann*, 127 A.3d at 471, is thus missing in the present case. More fundamentally, *Tann* required the trial court in this case either to declare a mistrial or to take some other step to address the potential prejudice arising from the outburst. 127 A.3d at 470. We affirmed in *Tann* in significant part because the trial court properly followed that legal framework, by giving a curative instruction. *Id.* at 470-71. We presume that juries follow such instructions. *See, e.g.*, *McRoy v. United States*, 106 A.3d 1051, 1061 (D.C. 2015) ("[T]he court issued a clear curative instruction, which we presume the jury followed, absent evidence to the contrary."). In *Tann*, the risk of jury taint was addressed in a way that we presume effective. In the present case, the trial court took no steps to address the risk of jury taint. Under the legal framework that we applied in *Tann* and that binds us here, reversal is required.

I would reverse and remand the case for further proceedings. I therefore respectfully dissent in part.